PIERCE, Judge.
This is an appeal by appellant Carol E. Williams, defendant below, from a final judgment finding for appellee Thomas G. Williams, plaintiff below, in a suit brought to annul the marriage between the parties, and decreeing accordingly.
On March 30, 1967, the parties hereto married each other. They had met only about two months before, but during the interim, from the record here, it is obvious their “courtin’ ” began and continued in earnest. In fact, they loved not wisely but too well — and too soon. For at the time the marriage vows were exchanged, Carol was two months pregnant.
On May 10, 1967, Thomas filed complaint in the Pinellas County Circuit Court for annulment of the marriage. Carol answered with affirmative defenses, and counterclaimed for divorce, alimony, attorney’s fees and expenses, and child support *49 incident to the impending- birth. Plaintiff husband answered the counterclaim, denying that his wife was entitled to any relief because “there is no valid marriage between the parties * * * under the law.”
Final testimony on the issues was taken on September 12, 1967, and on November 22, 1967, the trial Judge entered final judgment, finding that Thomas married Carol because of his “love and affection” for her; that Carol married Thomas “for the purpose of preventing illegitimacy of the child * * * and * * * had no intention of fulfilling the duties and obligations of a wife”; and that the child, which in the meantime had been born on October 26, 1967 and given the name of Allen Bradley Williams, “is legitimate”, but that such ruling did not pass “on the issue of paternity of said child, as paternity issues must be resolved in a separate proceeding”. The judgment thereupon decreed the annulment of the marriage as prayed by Thomas and denied any relief to Carol. We reverse, and remand the cause for further proceedings.
The parties were married three weeks, during which time they each worked at separate jobs all day, getting home about six or seven o’clock P.M. Despite this work schedule, they went out visiting in the evening and had dinner with mutual friends on several occasions, once at the home of the son of Thomas’s boss. Once or twice a week, Carol, who was a beautician, scheduled work appointments at her shop “for working people” at night, staying until 9:30 or 10 o’clock, also she “worked on wigs” at her shop on occasions after the regular 5 o’clock closing hour. Shortly after their marriage Carol attended a week-end beauticians convention in Clear-water. Also, she went to Tallahassee to take her “State Board” examination, accompanied by Thomas’s mother. On a couple of nights Carol went over to “her cousin’s house * * * and her aunt’s * * * to do their hair”, and get some of her belongings.
The evidence conflicts as to whether the parties had sexual relations after the wedding. Thomas testified that he “tried to” the first night, but she refused. Carol testified he not only “tried to” but “did”, by physical force against her will. It is admitted no such relations took place thereafter. There is no serious dispute as to their reciprocal attitudes before the marriage. It is agreed they were extremely friendly and “chummy” from the time they met in January until about the middle of March, a couple of weeks before the, wedding. During this latter interval their moods were not “so chummy”.
They both knew she was pregnant by the first part of February. Saying he did not marry her because of her pregnancy, Thomas stated that during the last week or two of their “courtship” her ardor had seemingly cooled but his feelings toward her “were very strong and I just knew that’s what I wanted”. She testified that she “had told him that my feelings had changed for him, I didn’t feel as much affection for him as I had before, and that if we did go ahead and get married that I didn’t intend to perform sexual relations with him right away because I didn’t feel that much affection for him at the time, but I told him that if my feelings did change, and when they did, I would certainly let him know”. Thomas did not deny this testimony on her part although he testified thereafter as a rebuttal witness.
They both insisted they were individually trying to “save the marriage”, even to the point of discussing going to a marriage counsellor, but they both finally did go together to a minister, with whom they talked at length. But things reached an unhappy climax on the evening of April 22nd, when they had an argument in their apartment resulting in a physical encounter between them. She said he “started holding me down on the bed then and I was trying to get away from him and there was a struggle and I had — I was on the floor at that time trying to get away from him *50 and he struck me twice * * * on the side of my head * * * She left the house and called the police who came and “took me back to the apartment to get my clothes that I would need for the following day * * * In rebuttal, Thomas admitted that he “did slap her * * * with an open hand” and did not deny the other details of her version of the separation. She frankly admitted that her “major purpose” for the marriage was “to provide a name for the baby”.
Although the Chancellor denied Carol’s counterclaim for divorce, no finding was made as to whether Thomas was “guilty of extreme cruelty to and upon” her person, the ground relied upon by her. Determination of this question, of course, depends solely upon acts and doings of the parties from the time of the marriage to the time of separation. And in view of our disposition that the cause must be remanded for further proceedings, we pretermit further discusssion upon that phase of the case.
However, we are firmly of the opinion that annulment of the marriage is not warranted. In Stone v. Stone, 1947, 159 Fla. 624, 32 So.2d 278, the Supreme Court, in holding that a marriage ceremony entered into between the younger brother of the putative father and the expectant mother was voidable, held:
“The courts should not hesitate to annul such marriages at the behest of either party on clear and unequivocal proof that the purported marriage was so entered into and that the marriage status was never consummated by any cohabitation. This rule would not apply in cases where the reputed father of the child marries the mother without any fraud or deceit being practiced on him.”
The holding in Stone clearly governs disposition of the case sub judice because, first, there was no “clear and unequivocal proof” that cohabitation did not occur after the marriage. Carol was emphatic as to the forcible cohabitation on the marital night. And Thomas’ denial of such cohabitation does not accrue to “clear and unequivocal proof” of his contention, especially in the absence of any finding on that point by the Chancellor. Secondly, there was no “fraud or deceit being practiced” by Carol upon Thomas because she testified that before the marriage she told Thomas that if they married she “didn’t intend to perform sexual relations with him right away * * * but * * * if my feelings did change, and when they did, I would certainly let him know”. He did not deny this testimony.
In Brandt v. Brandt, 1936, 123 Fla. 680, 167 So. 524, the Circuit Court had annulled a marriage where the man had married a woman upon her false representation that she was pregnant by him. Reversing, the Supreme Court held, speaking through the same Justice who authored the opinion in Stone, said:
“As we see it, the only question involved is whether or not a false representation made by a woman to a man with whom she has had sexual intercourse that she is pregnant by him, and thereby he is persuaded to marry her, is a sufficient ground to warrant the annulment of the marriage.
The authorities are not all one way. Some courts have held that such facts will warrant the annulment; but we fail to find in those decisions what we consider logical reasoning for such conclusion. Under such conditions, it cannot be logically said that the man marries the woman because he desires to marry a woman who' is pregnant, but the real reason for such marriage is more logically the fact that he knows he is at least in part responsible for the conduct which might have brought about the alleged condition.”
Another reason exists why the judgment of annulment should be reversed, and that is lack of corroboration of Thomas’s testimony on the issue of annulment. This 2nd District Court in Pickston v. *51 Dougherty, Fla.App.1959, 109 So.2d 577, 91 A.L.R.2d 618, held that:
“No decree for annulment of marriage may be granted upon the mere uncorroborated testimony of one of the parties to the action.”
Elimination of the annulment issue leaves in the instant case only the counterclaim of Carol for divorce^ and incidental relief. The “incidental relief” prayed for in the counterclaim encompasses alimony, court costs, attorney’s fees, pregnancy and delivery expenses, and child support after the birth of the child. After remand, all these incidental issues will be determinable by the trial Judge, the same as in any ordinary divorce case. The child is now almost a year old, and his custody is, of course, to be added to the issues before the Court.
The trial Court, in its previous judgment here appealed, found the child to be legitimate, with which finding we unhesitantly concur. As to the Court’s other finding that “paternity issues must be resolved in a separate proceeding”, we would disagree if decision were necessary, but our disposition here makes further discussion unnecessary.
Validity of the marriage being now established because annulment has been eliminated, and both parties admitting in their testimony they are the natural parents of the child, F.S. Section 65.14, F.S.A. provides plenary authority to determine all incidental matters such as custody, support, etc., as incidental to the main issue of divorce in Carol’s counterclaim.
The final judgment appealed is reversed and the cause remanded with directions for further proceedings in the Circuit Court consistent herewith, each party having the right to amend or replead as may be advised.
Reversed and remanded.
LILES, C. J., and HOBSON, J., concur.